**FLOATER VEHICLE, INC., Appellant,**

v.

**TRYCO MANFACTURING COM-PANY, INC., Appellee.**

**Patent Appeal No. 9173.**

United States Court of Customs and Patent Appeals.

June 20, 1974.

Eugene J. Mahoney, Columbus, Ohio (Mahoney, Miller & Stebens, Columbus, Ohio) atty. of record, for appellant.

Stanley C. Dalton, Chicago, Ill. (Hofgren, Wegner, Allen, Stellman, Chicago, Ill.) atty. of record, for appellee.

Before MARKEY, Chief Judge, RICH, LANE, and MILLER, Judges, and ALMOND, Senior Judge.

MILLER, Judge.

This is an appeal from the decision of the Trademark Trial and Appeal Board,

175 USPQ 761 (1972), granting appellee's petition to cancel the registration (No. 863,887) of appellant's assignor, Russell E. Jones, of the mark "FLOATER" for "agricultural tractor chassis and cab for transporting and distributing fertilizers and agricultural materials." The registration is dated January 21, 1969, and is based on an application filed December 7, 1967, alleging first use on April 20, 1967, and first use in interstate commerce on July 22, 1967.

In its petition, appellee (an Illinois corporation doing business at Decatur, Illinois) alleged that by the terms of a written agreement dated August 30, 1967,[1] with Jones, it was the owner of the mark at the time Jones filed his application for registration, so that registration issued to the wrong party.

The record shows that appellee is in the business of manufacturing all-purpose, all-weather vehicles *including* an agricultural tractor chassis and cab for transporting and distributing fertilizers and agricultural materials, and apparently uses the mark "FLOATER" in connection with the latter; that Jones developed a flotation agricultural vehicle in 1966 and 1967, and in April, 1967, sold one such vehicle bearing the mark "FLOATER" to Flo-Lizer, Inc., of Kingston, Ohio; that on July 22, 1967, appellee purchased a flotation vehicle for use as a demonstrator from Jones and transported such vehicle, bearing the mark "FLOATER," from Kingston, Ohio, to Maxwell, Indiana; that two other "FLOATER" machines bearing the mark "FLOATER" were sold to a Canadian company by Jones, one on or about August 15 and the other on or about September 12 of 1967; and that Jones, as a full-time employee, manufac-

tured for appellee, at the latter's leased premises in Chillicothe, Ohio, approximately ninety-five of the "FLOATER" vehicles, which appellee advertised and sold under its own name.

The board said it was clear that, at the time Jones filed his application, he was merely a full-time employee of appellee for the purpose of assembling "FLOATER" vehicles; also that he had contracted away any trademark rights he may have had in "FLOATER" for the duration of his employment.[2] Accordingly, it held that Jones could not claim any rights of ownership in the mark and that registration was issued on the basis of false statements of ownership made before the Patent Office.

Pertinent extracts from the contract between Jones and appellee are set forth below (emphasis supplied):

3. (a) In consideration for the other terms of this Agreement, Employee grants to Tryco, during the term of this Agreement and any renewals hereof, the exclusive right to manufacture, develop and sell all inventions and discoveries made by Employee *prior to* and during the term of this Agreement, including but not limited to any high-flotation, self-propelled vehicle conceived, designed or developed by Employee or his agents and any modifications thereof. It is understood that Employee has patent applications pending. All rights thereunder are the property of Employee except as hereinabove otherwise provided.

(b) During the period of this Agreement and any renewals hereof, Employer shall have the exclusive right to apply for patents, trademarks

1. Among other things, the agreement provides that Jones (a resident of Kingston, Ohio) had become an employee of appellee as of August 21, 1967, for a period of two years, subject to renewal. On July 9, 1969, Jones wrote appellee that he did not elect to renew the agreement.

2. The board's statement clearly implies that Jones was possessed of a trademark prior to

the employment agreement; and first use in commerce in 1967 prior to execution of the contract is supported not only by the August 15th sale to the Canadian company, but by the sale to appellant, an Illinois corporation, on July 22, 1967. That the Illinois corporation accepted delivery in Ohio did not render the sale any less "in commerce." Currin v. Wallace, 306 U.S. 1, 59 S.Ct. 379, 83 L.Ed. 441 (1939).

or similar rights for any and all inventions or discoveries made by Employee which have any connection with, or are along the lines of management, duties and work performed by Employee on *existing products*, new products, methods of manufacture and testing for Employer. Without additional compensation, Employee will perform all acts and execute such papers as are necessary and incident to obtaining and maintaining patents, etc., for all such inventions and discoveries, both in the United States and foreign countries and will transfer to and vest in Employer all rights, title and interest in said inventions and discoveries. The expense of seeking and obtaining such patents, etc., shall be Employer's.

(c) Employee shall have the exclusive right to apply for patents in foreign countries similar to those patents for which he now has applications pending in the United States. Acquisition of such patents, however, shall not limit Employer's exclusive right to manufacture as provided in paragraph 3.(a).

4. Employee has developed a high-flotation, self-propelled vehicle, hereinafter called "Floater", in which, pursuant to paragraph 3 of this Agreement, he assigns certain rights to Employer, and in consideration of the assignment of said rights to this particular vehicle; Employer further agrees as follows:

\*　　\*　　\*　　\*　　\*　　\*

(d) Employer will devote its established capabilities and reputation to the development and sale of "Floater" units in conjunction with the pursuit of Employer's present line of fertilizer equipment.

\*　　\*　　\*　　\*　　\*　　\*

5. Employer may subcontract to parties of its choice work to be performed pursuant to this Agreement.

.　　.　　.　　.

6. *This Agreement shall be interpreted* and enforced *according to the law of the State of Illinois.*

■ In determining the intention of the parties with respect to the trademark rights in "FLOATER," we note that paragraph 3.(a) grants Tryco the "exclusive right to manufacture, develope and sell all inventions and discoveries made by Employee *prior to* and during the term of this Agreement." (Emphasis supplied). However, the "exclusive right" granted Tryco under paragraph 3.(b) to apply for patents and trademarks for inventions or discoveries made by employee does not run to those made *prior to* the term of the agreement; rather to inventions and discoveries made by employee "which have any connection with . . . duties and work performed by Employee on *existing products*, new products, methods of manufacture and testing *for Employer*." (Emphasis supplied.) It is presumed that the words "prior to" were inserted in paragraph 3.(a) for a purpose, and we believe that if the parties had intended the "exclusive right" in paragraph 3.(b) to extend to inventions and discoveries made *prior to* the term of the agreement, they would have used the words "prior to," as they did in paragraph 3.(a). Martindell v. Lake Shore Nat. Bank, 15 Ill.2d 272, 154 N.E.2d 683 (1958). Obviously "existing products" relates to products of Tryco, which, on August 30, 1967, included "Employer's present line of fertilizer equipment" and did not include the "FLOATER" vehicle.[3] Jones' testimony that he told appellant's president, Robert West, that

---

3. Tryco did not begin production of "FLOATER" vehicles at the Chillicothe plant until the latter part of November, 1967. Jones built the major portion of one

of the vehicles for Tryco at his own plant, prior to operations at Chillicothe, but this was not completed until after that date.

he was going to get the "FLOATER" name registered in his (Jones) name, and that West "didn't seem a bit concerned about it" is uncontradicted and confirms our interpretation of the intention of the parties. Coney v. Rockford Life Ins. Co., 67 Ill.App.2d 395, 214 N. E.2d 1 (1966). Finally, it is to be noted that the agreement was drafted by appellee and that, if there is doubt about its meaning (which we do not have), it is to be construed most strongly against its author. Cedar Park Cemetary Ass'n., Inc. v. Village of Calumet Park, 398 Ill. 324, 75 N.E.2d 874 (1947).

■ Accordingly, we hold that the board was in error in finding that appellant contracted away any trademark rights he had in "FLOATER" and in holding that he could not properly claim any rights of ownership in the mark.

Although Jones testified that appellee was using the mark, he also testified that "It was an agreement between Mr. West and myself that floater would go on the machines that I built for them." Thus, it appears that appellee's use was that of a licensee under an oral agreement which expired when Jones ceased building the machines for appellee at the end of the two-year written contract. The petition for cancellation was not filed until September 24, 1969, following expiration of the oral license agreement, when appellee had no right to use the mark and, therefore, no standing to allege damage under 15 U.S.C. § 1064. See Prince Dog and Cat Food Co. v. Central Nebraska Packing Co., 305 F.2d 904, 49 CCPA 1328 (1962). Accordingly, we hold that the board erred in stating that petitioner as a present user of the mark is obviously damaged by the existence of the registration on the trademark register, and that it should have dismissed the petition for cancellation.

The decision of the board must be reversed.

Reversed.

LANE, Judge, concurs in the result.